This honorable appellate court for the second district is now open. The Honorable Justice Robert McLaren presiding along with Justice Susan Hutchinson and Justice George Bridges. The case is number 217-0299, People of the State of Illinois plaintiff-appellee v. Todd Christopher Smith, defendant-appellant, arguing for the appellant Jamie L. Montgomery, arguing for the appellee Barry W. Jacobs. Robert McLaren Thank you. A few comments before we start. As in the past, you will be both given 15 minutes to make your arguments in chief, and the appellant will have five minutes in rebuttal. Unlike oral arguments prior, we will not be, the panel will not be asking questions until the attorney is done making his or her presentation. And when the questions are asked, they will be Justice Hutchinson proceeding first, then Justice Bridges, and then finally myself. Please do not record any of this proceeding, and if you have, please destroy the recording. The only party that's supposed to be recording this is Jeffrey Kapp, the clerk of this court. I don't believe that I have anything further to say. Is there any questions that the counsel would like to ask before we get started? No. No. Okay. Thank you. Ms. Montgomery, you may proceed. Morning, Your Honors. Counsel. I'm Jamie Montgomery from the Office of the State Appellate Defender, and I represent Todd Smith, the defendant of Howenton's matter. The husband did it. It's a true crime trope so easily recognizable that fans of the true crime genre can order t-shirts and coffee mugs with the phrase printed on them. So it's perhaps no surprise that when Katrina Smith went missing and was later found murdered, my client, her husband, was the prime suspect. The problem for the state was that despite its best investigative efforts, there was no direct evidence that Todd had anything to do with Katrina's death. Thus, at trial, the state relied entirely on circumstantial evidence. And of course, a criminal conviction may be based solely on circumstantial evidence, but here there were three major areas of circumstantial evidence that were problematic. I'll address them in the reverse order in which they are presented in my brief. The first, or third, as it is in the brief. The court erred in allowing a lay witness to testify about historical cell-powered analysis, a topic that requires the testimony of an expert witness. As noted in our brief, Illinois courts have not directly ruled on this issue. However, federal and state courts that have, have generally ruled that the testimony interpreting cell records in order to draw conclusions about a suspect or at least a specific phone location must come in via qualified expert testimony. And notably, the fact that, or I should say, the few cases that, those cases in Illinois that address adjacent issues, such as the necessity of a prior hearing for cell, historical cell-powered analysis and mapping, essentially assume that the testimony comes in through an expert. You know, where there's no need to consider whether or not a prior hearing is necessary if it's not scientific evidence coming in through an expert. Here, defense counsel repeatedly expressed concern that the state would elicit testimony placing Todd, or at least his phone, in various locations based on cell-powered data and objected to such testimony on the basis that the state had not disclosed an expert prior to trial and had not qualified Detective Cunningham as an expert at trial. Now, at both pre-trial and during the trial, the state insisted that Cunningham's testimony would only really, regarding the cell-powered analysis, would only cover the course of his investigation and that they weren't presenting him as an expert. Then at trial, Cunningham testified to the course of his investigation and went on to testify that based on his interpretation of the cell phone records, using azimuth and sector ADI and such, Todd's phone was in various locations tied to other evidence in the case. This was exactly what defense counsel and the rule of evidence intend to prevent, that the reliability requirements for expert testimony will be evaded simply by offering an expert and lay witness clothing. The second issue raised in my brief is that the court abused its discretion in allowing investigator Bob Juanez to render expert opinion as to the source and meaning of the GPS coordinates he recovered from the Hyder file system in Todd's computer. Now, this testimony should not have been admitted for two reasons. The first was that Bob Juanez was not qualified as an expert in GPS or track stick, or the track stick device that was used here. And second, because his interpretations of the GPS coordinates were unreliable, their risk of prejudice far outweighed their appropriate value. Now, turning to the first, Bob Juanez was qualified as an expert in computer and cell using software to recover digital data from computers and cell phones. He admitted that he had no training in GPS technology or the track stick software or device here. Because of that, he was only an expert, as the court found him to be here, in computer and cell phone forensics. Now, when he turned to interpreting the GPS coordinates, his interpretations were unreliable and should not have been admitted because of that. As noted in the brief, by his own admission, he did not know what the dates and times recorded for each of the coordinates actually meant, how they were recorded by the computer, or whether they were even captured by a tracking device. He simply assumed that they were. Moreover, he testified that the timestamps on the GPS coordinates were consistent with the surveillance videos and that the timestamps were consistent with someone walking as seen in the videos and then also where the GPS coordinates were. Now, but the problem was that that information was, like I said, they were not consistent with those things. The timestamps were off by two hours, at least. And the fact that the first GPS coordinates were recorded at 9.28 p.m. and the last ones recorded by the Smith home were recorded at 9.30 p.m. It's not, at least to my knowledge, humanly possible for someone to walk at least a mile in that amount of time because those, his opinions were not based on anything reliable and they should not have been admitted. Their probative value was far outweighed by their prejudicial effect. And having been deemed an expert, his opinion bore an aura of reliability and trustworthiness. And his opinion regarding the GPS coordinates essentially became the theme of the state's rebuttal closing, that the GPS tracker showed Todd walking from where he abandoned the car allegedly and various points where evidence had been found to returning home. The testimony of Bob Juanez basically vouched for the state's theory of the case such that in order to acquit Todd, the jury would have to overcome the fact that an expert endorsed the state's theory. Third, the court erred in admitting evidence of the flyer and the flyer incident because the state did not establish at trial that Todd participated in or had knowledge of the incident. The state wanted to get this information in as other crimes slash bad act evidence and in order to, as proof of motive or evidence of motive. And in order to do so, the state must prove beyond a mere suspicion that the defendant committed the other bad act or participated in its commission. At the pretrial hearing, the court correctly found that there was no evidence that Todd was the person who actually threw the flyers in the parking lot. Instead, the court found that the evidence was admissible for two reasons. First, the court said that the fact that the words from the flyer were recovered in the hyperfile entries during the forensic analysis of the computer was circumstantial evidence that Todd made the flyer. And second, that Christina Bayek's testimony at the hearing, that when she spoke to Todd on October 23rd, he told her he knew about the flyer incident. And the court correctly found from that testimony, one could infer his knowledge of the idea that perhaps Katrina was having an affair from which one could infer motive. The problem is that at trial, Christina Bayek did not testify to any of that. She said nothing about that part. So the testimony should not have come in at trial on that basis. And the fact that the court's first basis that the information was found, the words from the flyer were found in the hyperfile entries, was based on basically an assumption that the only reason that the words could have been in the computer were that Todd made the flyer himself. That assumption was completely unreasonable given that there was no proof at trial or at the hearing as to when the hyperfile entries were made or by who. And we know from other evidence that the police had shown the flyer to Todd and the family during the investigation but before the laptop was seized. And we don't know the exact date that Katrina moved out. So it's possible that after the flyer incident, Katrina had used Todd's computer to search for information or that Todd used the computer to search for information after being shown by the police. And it's not unreasonable that a spouse would know the password for their spouse's computer. And without knowing when the hyperfile containing the words was created, no reasonable person could find that the hyperfile was proof beyond a mere suspicion that Todd participated in or knew about the flyer incident or that he knew about the flyer at the time of Katrina's death. And without showing that Todd knew of the flyer incident at the time Katrina was killed, either through the testimony of Christina Byack, which didn't come through, or because the hyperfile evidence did not establish beyond a mere suspicion that Todd knew of the flyer incident at the time Katrina was killed, the flyer evidence was not probative as motive and was inimitable potency evidence. For all these reasons and those presented in this brief, Todd Smith respectfully requests that this court reverse his convictions and remand for a new trial. Thank you. Are you done? Yes. Okay. Thank you. Justice Hutchinson, do you have any questions? Yes. Thank you. What role did Stacey Capella play here in establishing the records and the purposes of the towers and the things that they do? She was presented to basically lay the foundation for the admissibility of the records. She was the keeper of the records for one of the cell phone companies. But didn't she also address things about the actual cell towers, their capacity, their power, things of that nature that as an analyst for Verizon she was capable of doing? She did testify to some of that information. Her testimony was not nearly as in-depth as Cunningham's testimony. She did not place the defendant's phone in various locations based on what tower he was hanging off of. She testified in general about the power of the towers and their range and such. But she didn't get into the detailed stuff like Cunningham did about looking at specific sector radii and which antennas were used and that sort of thing. But in essence, didn't Officer Cunningham or Detective Cunningham, I apologize for not knowing his correct title, didn't he use that information and also establish or rely on the same principles? They're not exact. They have different distances. It depends on the territory, on the geography. Didn't he do much the same thing in his testimony? He did. And I guess my response to that would be that the use of, I mean, without having someone to testify, without having an expert testifying and analyzing the cell tower data the way that Cunningham did, Capella's testimony about the ranges sort of has, it becomes meaningless in that if the state had not, if the state wanted to put in testimony about locating Todd's phone, it needed to have an expert to do so. And it did not present an expert to do that. And Capella testified about, like I said, the general ideas of it. But we don't know, actually, because she was not presented as an expert in cell tower analysis, whether she was qualified to do that or not. She was considered an expert to the extent that she could verify that these were the cell phone records and where the towers were and what their general range was. But she did not get into placing Todd at a specific location. Well, it doesn't appear that Officer Cunningham did either, because there's a point talking about signal strength of the equipment. And he says that because, just because something is powerful, that it could go a certain distance doesn't mean that, in fact, it does. It just depends on how the antennas are arranged on the sites themselves as to how far they actually, that's actually going to shoot. So isn't he just speculating as well? I mean, not speculating, but he's not saying this is where he was and this is how I know it. He is just saying that based upon his knowledge, cell towers can be helpful and can give you some information, but it may not necessarily be true. So isn't he qualifying and recognizing that he's not an expert in this case? No. He was qualifying what he was saying. I agree. However, the state questioning him at length and having him basically testify for pages about how cell towers work and about the sector radii and the azimuths and all of that, gave the premium of expertise to him, even though he did not have it. And despite the fact that he said, he couched some of his testimony in that, he ultimately testified that Todd's phone was in specific range of various towers that it said were, that his phone was pinging off of towers that were near places where evidence was found in this case. And that testimony filled in holes in the state's circumstantial case. And if his testimony as a lay witness, even as a police officer, if he's testifying as a lay witness about something that requires information beyond general knowledge and his observations, if he's testifying about scientific information and things that require knowledge beyond the average ken of the jurors, such as sector radii and azimuths and terrain and that sort of thing, that is beyond his lay witness opinion and goes into the realm of expert opinion. And he should not have been permitted to do so. Well, the trial judge found that at best the weight of the testimony was at issue, not the admissibility. And wouldn't he have instructed the jury in that consideration as well? I don't recall specifically whether he instructed the jury regarding that. However, my interpretation of the court's rulings at the pre-trial hearings about that was more in the vein of the court was saying, well, rather than addressing the question that defense counsel was presenting, which was there needs to be an expert for this kind of testimony and the state has not provided me with discovery regarding an expert and this person they want to have testify about this. I've received no information that qualifies as an expert. And the state said repeatedly to the judge, oh, we're just going to put this in for course of investigation. And, you know, to the extent that the judge, you know, understood that the state was going to have, you know, Cunningham testify that, you know, I did some cell phone analysis and discovered that, you know, and because of cell phone analysis I conducted, I then did this, that and the other thing. And that at trial defense counsel would be able to argue that, you know, the weight of his testimony or the weight of his, you know, they could question whether or not that investigation was reliable based on whether or not Cunningham, you know, knew what he was doing and was missing the point that the issue here was this must be presented through expert testimony. And we either need to say Cunningham is an expert and I need to have all the proper, you know, TVs and, you know, disclosures and we need to have, you know, we need to be able to voir dire him on his expertise. Without having gotten to that point, you know, the reliability of his testimony was never determined and saying that it went to the weight, not the admissibility, misses the point. All right. I probably could take a lot more time with questions, but I'm going to say thank you, counsel, and let my colleagues continue. Thank you. Thank you. Justice Bridges, do you have any questions? I do. Thank you very much. Ms. Montgomery, the trial court allowed the flyer to be admitted for motive evidence. Is that correct? Correct. So my question is, does the phrase regarding Guy and his wife that was in the hydrophile of his computer provide some evidence that the defendant believed his wife was having a sexual relationship with another man? And isn't that classic motive evidence? I believe that if the state had been able to show that that information had been recorded in the computer at a specific time, which would be at or before Katrina's, you know, before Katrina's demise, that might have gone to motive. The problem here is that in order to have it be motive evidence, I mean, the fact that he may have known she was having an affair, yes, of course, that's classic motive evidence. However, in order to present other bad acts evidence and motive evidence, the state has to show that the defendant didn't just have motive in the abstract. The case law requires that the state prove that the defendant knew about the motive at the time of the crime. Here, without knowing when the hydrophile was created, we have no idea when that was put in, and it could have been after the crime. It could have been, you know, as stated in the brief, it could have been someone searching to see if the information had been released in the media. It could have been Katrina searching the computer to see if Todd had made the flyers. It could have been Todd or somebody else searching the computer later. We don't know when that was created, and without knowing that, the state has completely failed to establish that the defendant knew about it at the time of the crime, and therefore, it should not have been admissible as motive evidence. And so, is it your position that without the evidence regarding the flyer, the verdict likely would have been different? Yes. I believe that this was a closely balanced case. As I've said, the case was based entirely on circumstantial evidence, and many of the, you know, much of the evidence in the case was, there was a lot of evidence that the state put on that looked at in a vacuum, might seem like, ooh, this is bad, there's this GPS thing following him, and ooh, there's this thing found on his computer that says that maybe he made the flyer, and oh, there's, you know, they did all this testing in the house, in the garage, and they did all this DNA testing, but when you scratch below the surface, none of it, it doesn't coincide. The theory is a lot of evidence that makes Todd look guilty, but none of it really fits together, and that's why the evidence was very closely balanced, and without these major areas, like, granted, motive does not have to be proven, but the fact that this motive evidence got in, had it not gotten in, the jurors would not have heard about anything about the flyer incident. They wouldn't have heard about the flyer, about the hyperfile system. They wouldn't have seen the flyer. They wouldn't have heard any of the testimony about the flyer incident at work, you know, and that was a significant portion of the state's case, and I think that without that evidence, the outcome would have been different. Also, you're not suggesting, regarding the cell tower information, that in order to testify as an expert, regarding cell tower analysis, that one must work for a telecommunication company, are you? No. In fact, there's... Go ahead, Your Honor. I was just going to say, because, in fact, when you cite this case, it was an FBI agent who provided the testimony regarding cell tower analysis. Isn't that correct? That's correct, and, in fact, that FBI agent appears in many, many, many cases in Illinois, both published and unpublished, as an expert in cell tower analysis. So, you know, it is possible for the state to have a cell tower analysis, you know, performed by an expert who can come in and answer the appropriate questions and be qualified appropriately. Here, for whatever reason, the state chose not to do that and skirted the reliability requirements by saying that Cunningham was not going to testify as an expert. Thank you, Ms. Cunningham, and thank you, Justice McClaren. That's all I have for now. Okay. Ms. Montgomery, I believe it's your position that the officer that dealt with the cell towers had to be an expert. Is that not correct? Yes. Does it also then follow that you need an expert to impeach the expert? I would suppose, yes, and, you know, that was one of the, yes, my answer is yes. The problem with the fact that Cunningham was not disclosed as an expert and was not qualified as an expert in the appropriate manners meant that the defense was unable to prepare before trial and bring on their own expert witness to counter Cunningham's testimony. And, you know, they were basically sandbagged. They were told that he wasn't going to testify about cell tower analysis, and then he came in and he did. And they were left five days into trial without knowledge that that was what he was going to testify to. Well, I'm going to use my common sense and everyday experience and point out that it doesn't take an expert to plug in latitude and longitude coordinates into MapQuest or Google Maps or Bing Maps and have that spot show up on a world map. And I don't consider myself an expert, so I don't know really why a lawyer, a secretary for a lawyer, a librarian, or anybody, I would think, could be qualified to get up on the stand and say, I took the same coordinates and I came up with a designation indicating that this happened in Joliet instead of in McHenry County. So the idea that you needed an expert to impeach a police officer who is using quantifiable, locatable latitude and longitude and then putting it onto a map doesn't strike me as being something that's done with expertise. Would you like to comment on the idea that virtually anybody could have taken the same information and be plotted it and seen that it came up in a different place and could then have testified or even on cross-examination the witness could have been impeached with a second inquiry? The case law is fairly clear that in order to present, you know, if the state here had simply brought him on to say, I plotted, I put in the locations of where the towers are and here's the map that shows where they are, that is not expert opinion. That doesn't require an expert. Simply transferring data about the location of something into a map and plotting it does not require expert testimony. What does require expert testimony, because the case is acknowledged, the difference is when you're saying that because this cell tower pinged, that means that the phone was, you know, at this location or that, you know, if you're using, you're trying to say that the person was here, that's what requires the expertise because it's more than simply that a tower has, you know, a specific radius or, you know, has a range around it of, you know, one to three miles or may have more because the cell phone does not always use the tower closest to the location of where the phone is and there's various things that go into figuring out which tower is used and why. So, you know, in cases where the issue is something like, was the phone near Joliet or was the phone near Rockford, you know, I agree that in that kind of a situation, this would be not as big of a deal. But here, what happened was that the state had Cunningham testify that these are the towers that were used, so, and these towers were within range of, you know, this, that, and the other relevant location. Therefore, we know that his phone was there, so he must have been there. And that is beyond, you know, the chance of the average person because it is not simply putting in and saying this is where the tower is. It's saying because this tower was used, we know that the defendant was in this location. I don't believe the witness ever testified to the syllogism that you're just relating, which is that because the phone happened to be pinging in a certain location that the defendant had to be present with his phone. Am I correct? I thought the witness never testified that he said what you just said, which is, well, his phone has to be with him, and therefore he must be there. No, he did not. You're correct, Your Honor. He did not say that, he did not specifically say that the defendant had his phone and therefore he must have been there and that he was with his phone. What he testified to was he, you know, compared places where the, where the towers were and found that, like, for one of them it was, you know, it was by, you know, one of the towers was near where Katrina's wallet had been found, which was far away from all the other evidence. And then there was a ping at another tower in a different location that, you know, and then another location, and another location drove back home and did something else. And so they weren't placing, necessarily placing Todd, they were placing his phone. And in cases, there are cases where, you know, the, let's see, for instance, in the, well, it's an unpublished case, so I shouldn't cite you, but I know there are cases where, you know, a similar issue is raised and, you know, the cop says, or the police officer says that the phones were in that particular radius. But, you know, in this situation, the defense isn't arguing that Todd was not with his phone or that someone else had his phone. So the only implication then, if Todd's phone is in a particular location or is pinging off towers in a particular location, is that Todd is there. And so, you know, simply in this instance, saying that the police officer only testified, the non-expert only testified that the phone was within range of this tower, is no different than saying the defendant was within range of this tower. Am I correct in believing that these pings were not actually phone calls that took place at a given point in time in a given location? In other words, my point being that the defendant didn't call somebody in the location that the tower indicates is where the wallet was found, and you would not have, or there is no third-party witness who would testify that, yes, at such and such a time on such and such a date, I had a phone conversation with the defendant, which would then indicate that the, you could imply that based upon the fact that the person was talking on a phone that pinged in this area and the person recognized the defendant's voice, that therefore there could be, in fact, a location given. Correct. Okay. You mentioned that the reason why this officer was supposed to have been an expert is because it was based upon scientific expertise. Is that correct? The, I may have misspoken and said that it was based on scientific expertise. I know that there is case law that says that, as you, what you brought up earlier about plotting GPS, you know, plotting coordinates or locations of towers onto a map does not require, is not scientific. I'm aware of that. But the problem is that the going beyond and using the data provided from the cell company, from the cell phone company like Cunningham did here, which was, you know, information about which towers were where and what the sector radii were and whatever azimuth means and, you know, knowing which towers were, you know, overloaded or were down for the day or whatever, that requires more information than a lay witness has the ability to testify to. I understand that science essentially is a formulation of a theory which through controlled experimentation and reproducibility is supposed to result in principles, laws, or just a syllogism with a conclusion. Your question is, do I know that's what science is? Yes. Yes, I do. I'm married to a chemical engineer. Okay. The point is, is that I believe that the nature and extent of this witness's testimony is consistent with the state's theory, but it doesn't necessarily prove it. Would you agree with that? Correct. So if it is consistent with, but does not necessarily establish the fact beyond a reasonable doubt, why is it incompetent, inadmissible evidence that the jury can't consider? Well, if you, okay, I may have answered too quickly before. The testimony, has this testimony been presented through an expert, qualified and properly vordered, and such, then it would have been, you know, could be consistent with the state's theory. And that also assumes that having done so, we would know that the towers that were pinged were the only possible towers that could have pinged based on historical cell site analysis. Here, the officer simply said, this is the tower that was pinged. Aren't you confusing the testimony of the employee from the phone company who qualified the records and indicated where the pings were located? And now you're ascribing the necessity for the officer to have that expertise. He is doing nothing more from what I can tell is taking the information, which was admitted to the evidence based upon the foundation laid by the employee of the phone company. And so you have an expert, or at least someone who's given a foundation to those figures. And the only thing the officer did was apply those figures to a map. So why do you need an expert? Or put another way, how many experts do you need? Do you need an expert to lay a foundation as a business record, and then you need another expert to plot the lines? No, I believe the case law says you don't need an expert to put in the business record. That wasn't something that I researched in working on the case, because that wasn't an issue I was raising. But I believe the case law says that the person from the cell phone company does not have to be qualified as an expert in order to admit the business record. Rather than continue this past the lunch hour, I'm going to ask one more question, and that is what was the crime that was committed when the vehicle distributed or dispersed the flyers? Because I believe your argument was claiming that this was other crimes that were inadmissible. Did you not? Yes. Other crimes evidence is not necessarily only... And my point is, what was the other crime that was committed? Well, there was... It's not a crime to my knowledge to libel somebody. It's a tort. And truth is a defense besides, so it may not even be a tort. And from what I understand, there was some admission, so it would suggest that it wasn't necessarily a tort. So if it isn't a tort, what is it? Is it littering? Well, there's littering, but the other issue is that the state presented it as other bad acts within the umbrella of other crimes. So it's not limited simply to... My understanding is that it's not limited simply to just a crime, but that other bad acts are included within that umbrella. And yeah, I mean, it could be littering. It could be harassment. I believe you used the term other crimes. And so would it be more correct to say that it really wasn't other crimes so much as it was basically whether or not it was more prejudicial than it was provative insofar as being any acts, whether they were bad or good, or whether they were relevant or irrelevant? Yeah, I mean, ultimately it comes down to this entire situation with the flyers was far more prejudicial than it was provative based on the variety of issues we discussed. Thank you. I have no further questions. Does either Justice Hutchinson or Justice Bridges have any further questions? No, thank you. No, thank you. Thank you. You will be given five minutes of rebuttal, Ms. Montgomery. Okay, thank you. Thank you. Mr. Jacobs, you may proceed. Good morning. May it please the court and counsel, this is Barry Jacobs on behalf of the people of the state of Illinois as appellee. The defendant, the three issues raised by the defendant all involve computer, Internet and cell evidence. The evidence challenge is highly detailed and was generated via current computer and Internet and cellular technologies. However, however, technical evidence was not incapable of common understanding and was properly admitted by the trial court. The people assert that the court did not abuse its discretion regarding any of the challenge rulings. Moreover, even if the court did err by admitting the challenged evidence involving these computer, Internet and cell technologies, the error was harmless as the overwhelming unchallenged circumstantial evidence that was presented here established defendant's guilt. At page 26 of the state brief, it's noted some of the circumstantial evidence that wasn't this challenged evidence, specifically defendant's reluctance to check on his wife at the condo when her supervisor, Ms. Booyak, called him because Katrina had failed to come to work on the 23rd of October. His resistance to aid the police also pointed toward his guilt. His confrontational and reaction to the police and his consistent failure to request help from the police also pointed to his guilt. He lied to the police about files he deleted from his computer that were revealed in 2015 through searches conducted by Detective Juanez using newer software techniques, and that also pointed towards his guilt. That's just a smattering of the circumstantial evidence that overwhelmingly established defendant's guilt that wasn't challenged here. Excuse me about that. Turning to the first issue. The defendant challenges the admission of... I'm going to go in chronological order. The defendant challenges the admission of evidence of a flyer incident at Katrina Smith's work on October 9, 2012. The court admitted the flyer incident evidence finding that a hyperfill file found on the defendant's computer by Detective Juanez gave the inference that the defendant had knowledge of Katrina's affair with a co-worker and possibly showed that he traded the flyer. In finding the flyer incident evidence admissible, the court also found that the testimony of Christina Booyak established defendant's knowledge of Katrina's affair. The court didn't abuse its discretion in admitting that flyer incident evidence, pursuant to Rule 404B, as other good or bad act evidence for the purpose of showing motive. The court found evidence of the flyer incident was admissible to show motive, and hence, knowledge of Katrina's possible affair, if the defendant had knowledge of the flyer or traded the flyer. At hearings on, I believe, both the people and defendant's motions and lemonade, several witnesses for the state testified regarding the flyer incident on October 9, 2012. Presumably, Christina Booyak testified about Katrina's suspicion that the defendant may have been responsible for the flyer incident. Booyak testified that Katrina believed the defendant was following her and tracking her phone and that a phone conversation with a defendant on October 23, 2012, the defendant told Christina Booyak that he knew of the flyer incident and thus the rumor of Katrina's affair and of a subsequent phone call to Booyak where the caller disguised his voice and spoke about the flyer incident. The trial court ruled that the flyer incident evidence, including the high-result evidence, was admissible as it was relevant to motive because it allowed the inference to be made that the defendant had knowledge of the extramarital affair prior to Katrina's murder. The defendant now argues that the flyer evidence was wrongly admitted to show motive because Christina Booyak did not testify at trial that the defendant told her he knew of the flyer incident. And thus, the people did not show that the defendant knew of the flyer or the affair before October 26, 2012, when Detective Wannans told the defendant and his family about the flyer incident. The defendant denied knowledge of the flyer incident on October 24, 2012. The defendant argues that the hydrophile file alone at trial was too speculative to be admitted as evidence of his knowledge of the flyer incident. It could have been added to the computer by some other user or at some later date, even though this computer was a password-protected computer that the defendant admitted he used, whereas Katrina used the desktop down in the home. The defendant's argument should fail for numerous reasons. The flyer incident evidence was ruled to be admissible prior to trial, and the admissibility of that evidence was not again challenged as to the lack of evidence showing defendant's knowledge of the affair at trial or in the motion for new trial. Furthermore, the flyer incident evidence was relevant to defendant's knowledge of the affair. The hydrophile file was also admissible on the issue of knowledge as it allowed the inference that defendant knew of the affair. The defendant was permitted to cross-examine Detective Wannans extensively about the hydrophile evidence, so any objection to the flyer incident evidence, such as the hydrophile file was added or viewed after Katrina disappeared, went to the weight of the evidence, not its admissibility. The defendant's knowledge of the flyer incident could be inferred from the flyer-related language in the hydrophile file found on his locked computer. That wasn't simply the three words that Detective Wannans testified about initially, and that was, cat fucks guy. Detective Wannans also testified that he found basically the entire body of the flyer in that hydrophile file. I reiterate the state's argument in its brief that under Wallace, that people need not show motive through direct testimony. Motive must only be inferrable from the evidence. Whether the defendant was the author of the flyer was a question for the jury to determine from the evidence. The hydrophile file was relevant and admissible to show defendant's knowledge of Katrina's affair and creation of the flyer itself. The weight to be attributed to the evidence on the issue of defendant's knowledge was for the jury to determine, which it did. There was a rational basis for the jury to conclude that the defendant created the flyer based on the presence of the hydrophile flyer incident evidence from his password-protected computer. Thus, the defendant fails to show that the court abused its discretion by admitting the flyer incident evidence. The decision was not so unreasonable or arbitrary that a reasonable person would not adopt the court's view, or that the flyer incident evidence was a material factor in the defendant's conviction. Without the flyer incident evidence, the verdict would likely have been different. As I noted, there was overwhelming, unchallenged circumstantial evidence that supported conviction in this case. Turning to the second issue, admission of detractor evidence in the match coordinates generated by the SuperTRAC-6 device, and that was found in an Internet cache on defendant's computer by Tijuana's. Excuse me. In reply, the defendant attacks the reliability of the GPS coordinates that were recovered from his laptop and asserts that Detective Juana's had no expertise to interpret these GPS coordinates, so the court erred by allowing Detective Juana to render, quote, Detective Juana's had been qualified as an expert witness in digital forensics examination and cell phone forensics, basically the extraction of data from devices. He wasn't qualified as an expert in TRAC-STIC, but he did give foundational testimony about his knowledge of TRAC-STIC, including that he had learned of its function by downloading and studying a TRAC-STIC tutorial and by contacting the maker of the app about its function. The defendant asserts in his reply at page 8 that Detective Juana did not simply relate coordinates from the defendant's computer, but explained his knowledge of TRAC-STIC and opined that coordinate maps were consistent with a person walking along the areas where physical evidence was recovered. The law is clear that an individual will be permitted to testify as an expert if his experience and qualifications are worthy of knowledge, which is not common to laypersons, and where such testimony will aid the trier of fact in reaching its conclusion. Expert testimony, however, is addressing matters of common knowledge, however, is not admissible unless the subject is difficult to understand and explain. Here, the foundation for Detective Juana's expert opinion under only Rule of Evidence 703 and 5 was provided, and that the coordinate data was reasonably reliable by law enforcement informing opinions about TRAC-STIC data. Detective Juana has testified about coordinate extraction and Google Earth map creation. Detective Juana has described SuperTRAC-STIC's function based on his research and the viewing of his tutorial, but admitted that without the actual tracking device, which was never recovered, he could not definitively testify that coordinate data on the defendant's computer was from the SuperTRAC-STIC device. He did testify that it was GPS coordinates and it was from some tracker or other device that had been plugged into the defendant's protected computer. The court did not allow, excuse me, the court did not err by allowing Detective Juana to testify about tracker data as the foundation was laid without objection and Detective Juana's basis of knowledge regarding the SuperTRAC-STIC's function had been explained. Further, Detective Juana was extensively cross-examined about the facts underlying his opinion. Thus, the court did not abuse this discretion by admitting Detective Juana's lay witness testimony on a subject of common knowledge, i.e., that coordinate data was consistent with a path of evidence found discarded with surveillance videos because the foundation was laid and the subject was difficult to understand and explain. Juana's testimony explained a matter of common knowledge, map coordinates, but did not violate evidence rules prohibiting lay witnesses from testifying about technical processes. The testimony was admissible because the testimony explained a subject that might otherwise have been difficult for the jury to understand. Detective Juana's opinion based on the coordinate data was that the coordinates were consistent with a person walking down a path along which evidence was shed. The defendant felt to show that no reasonable person would agree that Detective Juana's testimony regarding GPS coordinates found on the defendant's computer was reliable. Unlike Parr, that cited by the defendant, the foundation was properly laid for Detective Juana's opinion that the GPS coordinates were consistent with someone walking on foot or on a bike along the path where the evidence was recovered. This was not a determination that required Detective Juana's to account for timing, distance, or speed, and he in fact explained that disparities in the recorded time of the coordinates, he could not explain without having the actual tracking device. He was unaware and would not testify as to what the time zone was that the device was set to. As argued in the state's brief at page 45, Detective Juana's was extensively cross-examined about the timing, distance, and speed and did explain, again, that without having the device, he was unable to say with certainty if the recorded times that the computer had captured were accurate. The defendant felt to show the court abused its discretion by permitting Detective Juana's to testify about the source and meaning of the GPS coordinate evidence recovered from the defendant's laptop computer. And on the last issue, the records of the U.S. cellular phone company for defendant's cell phone were certified by affidavit here and testified to by a custodian of the records. They were admitted as records of activity under Illinois Rule of Evidence 803. Therefore, this case is distinguishable from the Ramos case cited by defendant wherein the cell records were not authenticated. The testimony of Detective Cunningham as a lay witness was not precluded by evidence rules  about how he read coordinates and codes from cellular records and plotted on a map to opine that defendant's cell phone was within one to three miles of the cell towers. The testimony interpreted by the court... Is that my time? Yeah. All right. I would just sum up that, again, the court did not abuse its discretion by allowing testimony about the flyer incident evidence, including the Hager file evidence on the issue of motive, by allowing expert testimony about the track record found on defendant's computer, or by permitting the lay witness testimony of Detective Cunningham to testify about the cell site tower analysis that he basically plotted onto a map as an investigative tool, which he explained in a demonstrative exhibit for the jury. There was no need for an expert to testify. The foundation for the records provided and the testimony of, I believe her name was Bala, provided the expert foundation for those records, including the azimuths, the radii... Your time is up. If you want to close, fine, but it doesn't seem like you're closing. I'll try to be more succinct. I would, again, there was no error. If there was, there was an amount of overwhelming physical evidence, as well as many pieces of circumstantial evidence. The defendant was reluctant to check on Katrina, as I mentioned. He continued to deny there was no marital problems when, in fact, there was evidence that there were any marital problems. He lied about where Katrina was. She was not house-sitting. There was physical evidence supporting the conclusion that Katrina was killed in the home, including blood evidence found on a bat in the garage. Defendants... Counsel, your time is up. Thank you. Thank you. I'd ask that this court affirm. Justice Hutchinson, do you have any questions? Yes, but I will be brief. Counsel for defendant argues that the information on the computer indicates that the words are there, but there's no evidence of when that information got onto the computer, and it could have happened after the October 22nd date, when people were just checking to see what might have been related in the news or otherwise. Is there any evidence, in fact, when those words, particularly the, you know, guy, stars, cat, is anywhere when those words were placed on that computer? Based on my recollection of Detective Juana's testimony, he was unable to say when the words were placed on the computer. He was able to say that almost the entire balance of the flyer, which was created, was present in that hybrid profile. He also explained the hybrid profile, how it would come to be there, and he indicated that this wasn't based on someone searching. This was based upon someone working on a file, which, when the computer went into sleep mode, would preserve the evidence. I would point out, also, that this issue was ruled upon by the court in the motion of limine. Of course, it was supported by Christina Budak's testimony at that point, that the defendant had told her on the 23rd that he knew about this. So, the defendant didn't challenge that ruling again. Of course, the motion for a new trial would have been the most likely place to do so, and that wasn't done. Well, the issue, I recognize that he knew about it when he talked to that supervisor on the 23rd, but did he know about it before October 22nd? Is that in any way established by this information on that computer? Not to my recollection, no. Okay. One other thing that's bothered me throughout this, we're spelling Katrina's name with a K, but yet the phrase that we're all talking about has cat with a C. Is there some significance to that? I don't recall any significance being attributed by the detective, but I do recall that the flyer had many contractions of words and different spellings, and the significance of that is unclear. From the jury's perspective, it would be unclear. I guess it could suggest that someone was unfamiliar with Katrina, or it could suggest that somebody was intentionally trying to portray themselves that way. Okay. One last question, and I did not know and still don't after I tried to wrap my head around the concept of an azimuth and a sector radii. If, and I'm not considering myself, you know, a reasonable person all the time, most people don't now that I think about it, but more importantly, how are those terms that the jury would understand without some expert information? Well, Detective Cunningham did explain what was meant. I don't recall if the technician from U.S. Cellular, Ms. Cavalla, explained what those terms meant, but Detective Cunningham did testify that he did not interpret really anything that was listed in those certified business records. The switches were noted, the signal strength was noted. His role really was just to plot those coordinates on a map. The azimuth, the radii, I believe were all contained within the records, which were certified by U.S. Cellular and its custodian. Then if they were contained in the records, why would there be a need for him to talk about what they were, which I believe he did. He did, but he was, again, explaining his investigative tool, which was the map that he had plotted those coordinates on. And he, to my recollection, did not go beyond what was contained within the records in terms of the azimuth, the radii. And he gave a very a very I wouldn't say nonspecific answer to the question, but the answer he gave about, he did not pinpoint, I should say, where the phone was. He only gave a fairly large range of one to three miles where this phone may have been based upon the pings to the cell towers. All right. Thank you, Mr. Jacobson. Thank you, Justice McClaren. I don't have any other questions at this time. Thank you. Thank you, Justice McClaren. Mr. Bridges, do you have any questions? I do. Thank you, Justice. And I'll be brief. Mr. Jacobson, doesn't elementary rules of evidence provide that a lay witness's testimony should be linked to opinions not based on scientific or technical or other specialized knowledge? Yes. And go ahead. I'm sorry. You're cutting out a bit, so I want to make sure I answer that. Yes, the rules of evidence prohibit experts from testifying about lay opinions is, I think, what I answered yes. And so following up to what Justice Hutchinson said, when you talk about asthma and radii, doesn't it do because of time? Let me ask you this. Let me go to this. Was Detective Cunningham qualified as an expert or someone with sub-power expertise in this case? No one was qualified as an expert. Also, I am aware that the custodian, Kabala, did assert that these records were accurate in terms of the radii and asthma that were contained within. Doesn't his testimony about the call details records and his opinion regarding the cell tower analysis place defendant in areas where the physical evidence was found, doesn't that go beyond a lay witness, a proper lay witness testimony? I don't believe so. Because again, Detective Cunningham simply testified about a demonstrative tool or gave testimony about an investigative tool that he used and he had created this map based upon the certified records of where these pings occurred. His testimony was that the pings were consistent with the evidence. So, I don't believe that he found it. So, no. The last question that I have is based on the evidence that was introduced in the trial, what makes it more probable than not that the defendant, the phrase found regarding Kat on the desktop, that this was a password protected computer, yes, other people can have your password, however, the defendant lived alone and by his own admission, Katrina used the desktop, he used the password protected laptop. There was, at the hearing on the motions in Lemonade, there was a lot of testimony from Katrina's friend who was there.  I don't believe that Katrina suspected that the defendant could have been responsible for this flyer, that he had wanted her to quit where she had been working and she was suspicious that maybe this was an attempt to get her fired. The real evidence that he inputted the information comes from the fact that it was not an e-mail, it appeared in an index search as part of a document that had been saved into this hyper file  in the real world, he was the one who had access to this hyper file and he used that password protected computer. There was no evidence that anyone else ever used that computer. Thank you, Mr. Jacobs and thank you, Justice McLaren. I have no further questions. Thank you. The hyper file was a file that is not typically like word or word perfect or an e-mail. It is metadata or it is a backup system that works behind the scenes, is that correct? That's my understanding, although I do believe it could be from a word processing program. Put another way, it's a shadow. Yes, that's my understanding. A shadow normally isn't created unless there is some object that creates the shadow insofar as being between a light source and a screen. Was there anything I'm suggesting to you that was there anything on the computer that would indicate that it was the image that created the shadow? Again, almost the complete body of the of the flyer was found within the hybrid full file. And this was 2015 after the defendant had had deleted. Have you ever heard of the Arthur Conan Doyle story about the dog that didn't bark? I'm sorry, I have not. Well, the point was he figured out the crime because the dog should have barked, but the dog didn't. And in this instance, we're looking at a hybrid file and there is no quote unquote image that the hybrid file backed up, which means that either through an act of God or some sort of solar storm, that computer was wiped. And it was wiped in so far as that hybrid file shadow was concerned. Is that reasonable and logical to assume? It seems reasonable. It's clear that the defendant deleted information from this computer and it would be the state's position that this is evidence of the shadow left behind from those deletions. Okay. Ms. Montgomery was suggesting that based upon the time frames that the tracking device, I believe it was, would indicate that the defendant would have to be similar to the flash in so far as moving a mile or some substantial distance at a walking pace would be virtually impossible so therefore this individual either is supernatural or the information has been impeached. What's your response to that? As I said, Detective Cunningham we're talking about Detective Wanek explained that without having the track stick device and knowing what time zone it was set to, he couldn't account for those times, those different times. Again, this goes not to the invisibility of the evidence but to the weight attributable to it. Detective Wanek was extensively cross-examined about his testimony and the jury could have concluded that this at least showed that someone was walking along the path of the scene.  haven't explained the coordinates. Do you know what zero azimuth is? It was explained. I think How about zero azimuth being north, 90 degree azimuth being east, 180 degrees azimuth being south, and 270 degrees being west. Pardon me. I believe that you are correct. My recollection is zero is north. These are directions that are determined by standing with a compass at the base of the cell tower that supposedly is pinged, correct? I don't believe that detail. If an azimuth of 180 degrees was recorded, that meant that the ping was due south of the tower. If it was 270 degrees, it was due west of the tower. Is there something unusual about azimuth in so far as weather forecasting or anything in so far as where the sun is on a daily basis in so far as its seasonal jaunt from the Tropic of Cancer through the tropics? I believe that it's virtually the same and not subject to interpretation. I don't believe there was testimony to the public. Thank you. I have no further questions. Ms. Montgomery, oh, I'm sorry. Justice Hutchinson, do you have any other questions? No, thank you. Justice Bridges, do you have any other questions? I do not, thanks. Thank you. Thank you. You're welcome. Ms. Montgomery,  any other questions? Your Honor, pardon me. Regarding the flyer incident, I need to correct something that has been misstated by the state. The hyper file language that was recovered was only the, I guess we call it the headline of the flyer. As noted in the opening brief on page 5, there was a lot more language on that flyer. The flyer itself is in the record and the evidence volume at page 23. The only thing that was recorded by hyper file was the one phrase, not the paragraph of information below that. And there was, despite the state's testimony, sorry, the state's argument that there had been testimony that things had been deleted off of Todd's computer, there was no testimony that established that a specific flyer or document to that extent had been deleted. I believe there was some information about the fact that he had deleted some internet browser history, not that he had wiped files off of the computer. Also, the state in its brief and in its argument today has stated that Todd denied any knowledge of the flyer and that that was a lie that he told to the police. That testimony was had at page 1101 of the record, and which was testimony at the pretrial hearing where I believe it was, it might have been one of the other police officers, the officer testified that when they showed Todd the flyer, he said he had no idea who could have done it. The testimony was not that he said he knew nothing about it. The testimony was he had no idea who would have done that. And that is a distinctly different statement than I don't know anything about that flyer. Okay, moving on to cell phone power pinging. Now, I'd like to draw the court's attention to the patent case that is discussed at length in my reply brief. This case is, the situation of the case, the testimony that came in is very similar to that issue in patent. And because here Cunningham went beyond simply testifying and showing the map, as I've argued previously. He testified for about 20 pages that various points were within ranges based on, for instance, on page 3,121 of the record. The prosecutor asked if there were any calls made by this  approximately 841 a.m. on October 23, 2012. Cunningham said yes. He talks about who it was to. And then the prosecutor says, and what was that cell site? And Cunningham answers he says it was the cell  located on Spring Creek Road with the azimuth of 60 degrees. And the prosecutor asks what would that coverage include? And Cunningham testifies that Todd has an office that is covered on that coverage area of the azimuth of 60 degrees. So he is placing various things at issue in this case to show and he's not just reading it off of information. He's interpreting where things are based on the tower and the azimuth and that is the province of an area of the azimuth  degrees. And   he says it was     Spring Creek Road with the azimuth of 60 degrees. And Cunningham testifies that Todd has an office that is covered on that coverage area of the azimuth of 60 degrees.     off of  but he's interpreting where things  on the azimuth of 60 degrees. And he's not just reading it off of information but he's interpreting where things are based on the azimuth         are based on the azimuth of 60 degrees. He's interpreting where things are based on the azimuth of 60 degrees. And he's interpreting where things are based on the azimuth of 60 degrees. The exchange was whether it was, you know, that call was placed that pinged the tower at a specific address with the azimuth of 60 degrees. And then the question was asked, okay, so with an azimuth of 60 degrees, what would that coverage include? And Cunningham responded, I was told that he had an office over at Perry Place that would include, and that office would be within that coverage area. So I'm not saying that he needed to be an expert to testify about where the office was located. I'm saying that by connecting that azimuth of 60 degrees and this, you know, various locations, that is the province of an expert, that he was interpreting the data using the azimuth and the sector ADI and all that and placing the defendant in specific locations, which ... When you object on the basis that it's an expert who supposedly should opine, aren't you presuming that an expert could opine within a reasonable degree of scientific certainty or expertise? Yes. I'm not aware of anything. Maybe you can tell me if you're aware of it, how you locate a specific point without triangulation. And so, I'm having a problem understanding how an expert who  an azimuth could extrapolate and determine with some sort of expertise a particular location along a line. If you've ever seen a